**STRIS & MAHER LLP**
PETER K. STRIS (SBN 216226)
pstris@stris.com
RACHANA A. PATHAK (SBN 218521)
rpathak@stris.com
DOUGLAS D. GEYSER (SBN 314342)
dgeyser@stris.com
JOHN STOKES (SBN 310847)
jstokes@stris.com
777 South Figueroa Street, Suite 3850
Los Angeles, CA 90017
T: (213) 995-6800 | F: (213) 261-0299

TILLMAN J. BRECKENRIDGE
(*pro hac vice* forthcoming)
1717 K Street Northwest, Suite 900
Washington, DC  20006
(202) 800-6030
tbreckenridge@stris.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**
MICHELLE C. YAU
(*pro hac vice* forthcoming)
myau@cohenmilstein.com
MARY J. BORTSCHELLER
(*pro hac vice* forthcoming)
mbortscheller@cohenmilstein.com
DANIEL R. SUTTER
(*pro hac vice* forthcoming)
dsutter@cohenmilstein.com
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
(202) 408-4600

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

**JURY TRIAL DEMANDED**

STEVEN TARACEVICZ, on behalf of himself, the WESTERN GLOBAL AIRLINES, INC. EMPLOYEE STOCK OWNERSHIP PLAN, and all other similarly situated individuals,

     Plaintiff,

    v.

PRUDENT FIDUCIARY SERVICES, LLC, MIGUEL PAREDES, WESTERN GLOBAL AIRLINES, INC., THE BOARD OF DIRECTORS OF WESTERN GLOBAL AIRLINES, INC., JAMES K. NEFF, CARMIT P. NEFF, and JOHN and JANE DOES 1 to 5,

     Defendants.

Case No. 2:21-cv-9615

**CLASS ACTION COMPLAINT**

## INTRODUCTION

1.     Plaintiff Steven Taracevicz, by his undersigned attorneys, on behalf of the Western Global Airlines, Inc. Employee Stock Ownership Plan and similarly situated participants in the plan, brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking plan-wide relief on behalf of the Western Global Airlines, Inc. Employee Stock Ownership Plan (the "Western Global ESOP" or the "ESOP") and on behalf of a class of participants (and their beneficiaries) vested in the ESOP. Plaintiff alleges the following based upon his personal knowledge and the independent investigation of Counsel.

2.     Western Global Airlines, Inc. (the "Company" or "Western Global") employs several hundred people, and, until October 23, 2020, was privately owned by Defendants James K. ("Jim") Neff and Carmit P. Neff (collectively, along with any Doe Defendants who sold shares in the Company to the ESOP, the "Sellers" or "Seller Defendants").

3.     In June 2020, the Seller Defendants created the Western Global ESOP for the purpose of purchasing 37.5% of the Sellers' private Western Global stock. Shortly following its creation, Defendants caused the ESOP to purchase 375,000 shares of Company stock from the Seller Defendants at an inflated price of $510 million or $1,360 per share.

4.     The newly created ESOP did not have any money to purchase the Western Global stock from the Sellers, so the ESOP borrowed the entire purchase price from the Company.[1]

5.     Western Global, in turn, lacked sufficient money to *lend* the ESOP the full $510 million purchase price. To raise those funds, the Company issued approximately $350 million in junk bonds. The Company originally offered the bonds at an interest rate of approximately 8.25%. That interest rate, however, turned out to be insufficient

---

[1] The purchase and loan transactions are collectively referred to herein as the "ESOP Transaction" or "Transaction."

to attract investors, forcing the Company to raise the interest rate above 9%, well above the usual rate at which a company would seek to borrow money to finance an ESOP transaction. Ultimately third-party demand for the junk bonds was insufficient to fund the ESOP Transaction and Jim Neff ended up purchasing a majority of the junk bonds.

6.      The Sellers, in other words, saddled the Company with enormous debt at exorbitant interest rates in order to pay themselves $510 million via the ESOP, while retaining full control over the Company and its day-to-day operations and loaning the company the money to pay themselves at over 9% interest.

7.      There is no recognized market for private stock in a company like Western Global, so the price the ESOP paid for the Sellers' stock was determined by a valuation report. The Sellers controlled the valuation upon which the purchase price was based. The valuation documents related to Western Global's stock are, and continue to be, controlled by the Seller Defendants. Plaintiff and other employee-participants have never been given access to the valuation reports underlying the value of the Western Global stock in their retirement accounts.

8.      Presumably, according to that valuation, the 37.5% stake the ESOP purchased was worth around $510 million—the ultimate sale price. So that's how much the Company loaned the ESOP and how much the Sellers, in turn, received. However, the valuation report (i.e., the stock appraisal) relied upon unreliable and unrealistic projections of Western Global's future cash flows and earnings to justify the $510 million purchase price . For example, the stock appraisal relied heavily on a discounted cash flow method of valuation where the stock's value is driven by Western Global's financial projections of future cash flows and earnings. These values were inflated by the Selling Board Members,[2] who controlled those projections and were conflicted because they directly benefited from the inflation of the amount they received from the

---

[2] As further explained below, the "Selling Board Members" are Defendants Jim Neff and Carmit P. Neff, who were owners of the Western Global stock and members of the Board of Directors for Western Global Airlines, Inc. at the time of the ESOP Transaction.

ESOP. The stock appraisal also failed to account for the control the Selling Board Members retained over the Company.

9.     As of December 2020, the Company reported that the shares were worth only $328 million. As a result, ESOP participants were forced to purchase Western Global shares for their 401(k) account at $1360 *even though* the shares were worth just $875 on the day they were actually allocated to participants' accounts: December 31, 2020.

10.     Despite the immediate, massive loss, the ESOP must pay yearly principal and interest on the full $510 million loan it received from the Company. And since the Transaction, the entirety of the retirement contributions that Western Global has made to the ESOP accounts have been used for that purpose.

11.     Unsurprisingly, Plaintiff and other employee-participants (whose ESOP retirement accounts were used to purchase the 37.5% of Western Global stock from the Sellers) were not given the chance to negotiate or otherwise take part in the determination of the price the ESOP paid for Western Global stock. They only found out about the ESOP Transaction after it was completed and the $510 million purchase price was approved.

12.     Rather than involving the employee-participants directly, the primary Sellers who were members of the Board of Western Global—the "Selling Board Members"—hand-picked Defendant Prudent Fiduciary Services, LLC ("PFS") and its owner, Defendant Miguel Paredes (together, "the Trustee"), to supposedly "represent" the ESOP and its participants before and after the ESOP Transaction. The Selling Board Members retained: (i) control of Western Global because, as Board members, they retained power over corporate decisions, and (ii) power over PFS because, as Board members, they retained the power to remove PFS from its Trustee position. In turn, the Trustee (who is appointed and can be removed by the Selling Board Members) "negotiated" the purchase price on behalf of the ESOP and now votes all shares of

CLASS ACTION COMPLAINT
CASE NO. 2:21-CV-9615

Company stock the ESOP holds. Thus, the Selling Board Members effectively retained control over the Trustee as well.

13.  Supposedly acting on behalf of the ESOP, the Trustee approved the $510 million purchase price, even though that amount exceeded the fair market value of the stock.

14.  Moreover, given that (1) the ESOP purchased only 37.5% of the Company, and (2) the Sellers effectively control the Trustee who is entitled to vote those shares, the ESOP participants have no power or control over Western Global. As a result, the price the ESOP paid for the stock should have reflected a steep lack-of-control discount. But the Trustee approved a purchase price that did not reflect a sufficient discount.

15.  Ultimately, the ESOP Transaction allowed the Sellers to cash out of their Western Global stock for significantly more than it was worth. And by creating the ESOP, the Sellers created a buyer to purchase their interest without having to give up a scintilla of control, and without having to negotiate the price for their stock with a truly independent third-party buyer.

16.  In short, the ESOP significantly overpaid for the stock it purchased from the Sellers, causing ESOP participants to suffer monetary losses in their retirement accounts. The ESOP Transaction also left the ESOP with significant debt to the Company, all while tying participants' retirement futures—now entirely invested in Western Global—to a company that itself became deeply indebted in order to finance the transaction. In the meantime, the Seller Defendants walked away with hundreds of millions.

17.  The actions of the Trustee and the Sellers violate ERISA in multiple respects.

18.  Under ERISA, the Trustee has a fiduciary obligation to act prudently and loyally on behalf of the ESOP and its participants. It must act not for the benefit of the Sellers, but with an "eye single" toward the interests of the ESOP and its participants. That means, among other things, that the Trustee must adequately investigate the

transaction and cannot agree to a deal that no reasonable arm's-length investor would agree to. Yet that is exactly what happened here, causing significant losses to the participants' ESOP retirement savings.

19.     As for the Sellers, they are "parties-in-interest" to and co-fiduciaries of the Plan. Under ERISA, that means they cannot sell their shares to the Plan for more than fair market value. Again, however, that is exactly what happened here, generating potentially hundreds of millions in excess profits for the Sellers.

20.     Plaintiff brings this action to recover the losses incurred by the Plan and to disgorge the profits wrongfully obtained by the Sellers.

## JURISDICTION AND VENUE

21.     This action arises under Title I of ERISA, 29 U.S.C. §§ 1001 et seq., and is brought by Plaintiff under ERISA § 502(a), 29 U.S.C. § 1132(a), to require the Trustee to make good to the Plan losses resulting from its violations of the provisions of Title I of ERISA, to obtain appropriate equitable relief against the Trustee and the Seller Defendants, to restore to the Plan any profits that have been made by breaching fiduciaries and parties-in-interest through the use of Plan assets, and to obtain other appropriate equitable and legal remedies in order to redress violations and enforce the provisions of ERISA.

22.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

23.     **Personal Jurisdiction.** This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts with, this District, and because ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), provides for nationwide service of process.

24.    **Venue**. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), for at least the following reasons:

       a.   The fiduciary breaches at issue took place in this District; and

       b.   Defendants may be found in this District, as they transact business in this District.

## PARTIES

### A.    Plaintiff

25.    Plaintiff Steven Taracevicz has been a Plan participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), at all relevant times. Plaintiff Taracevicz is employed at Western Global as a pilot.  He is a First Officer and is vested in the shares of Western Global in his Plan account.

### B.    Trustee Defendants

26.    Defendant PFS is a California Limited Liability Company. PFS bills itself as a provider of professional Independent Fiduciary/ESOP Trustee, ERISA compliance consulting, and expert witness services related to employee benefit plans such as qualified retirement plans and health and welfare plans. PFS's headquarters is at 100 N. Barranca St., Suite 870, West Covina, California 91791.

27.    PFS was the trustee of the Plan at the time of the ESOP Transaction. As trustee, PFS had sole and exclusive discretion to authorize and negotiate the ESOP Transaction on behalf of the Plan.

28.    Defendant Miguel Paredes is the Founder and President of PFS. Defendant Paredes's business address is at Prudent Fiduciary Services, LLC, 100 N. Barranca St., Suite 870, West Covina, California 91791.

29.    Defendant Paredes was the trustee of the Plan at the time of the ESOP Transaction and continues in that role today. As trustee, Defendant Paredes had sole and exclusive discretion to authorize and negotiate the ESOP Transaction on behalf of the Plan. Defendant PFS acted in the ESOP Transaction through Defendant Paredes.

30.    At the time of the ESOP Transaction, the Trustee was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it was the Plan's trustee within the meaning of ERISA § 403(a), 29 U.S.C. § 1103(a), and because it exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

31.    As Trustee, Defendants PFS and Defendant Paredes were named fiduciaries within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), and under the terms of the written instruments under which the Plan was established and maintained, including the Western Global, Inc. Employee Stock Ownership Trust.

32.    Throughout their terms as trustee of the Plan, including at the time of the ESOP Transaction, Defendant PFS and Defendant Paredes were service providers and thus parties-in-interest to the Plan within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

**C.    Seller Defendants**

33.    Seller Defendants Jim Neff, Carmit P. Neff, and Doe Defendants collectively sold a 37.5% interest in Western Global to the ESOP for $510 million in 2020.

34.    Defendant Jim Neff is and was at the time of the ESOP Transaction the Founder and CEO of Western Global and a member of the Board of Directors. He was also a selling shareholder in the ESOP Transaction. On information and belief, he may be found in this District, where he has conducted business with the Trustee.

35.    Defendant Carmit P. Neff was at the time of the ESOP Transaction a Director of Western Global. He was a selling shareholder in the ESOP Transaction. On information and belief, he may be found in this District, where he has conducted business with the Trustee.

36.     The members of Western Global's Board of Directors had, at all relevant times, the power to appoint and remove the Trustee of the ESOP and the Plan Administrator. As such, they each exercised discretionary authority or discretionary control respecting management of the ESOP and each are fiduciaries with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

37.     Further, each of the Seller Defendants was a party-in-interest to the ESOP within the meaning of ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), because each was, at all relevant times, a Board member with authority to appoint the ESOP Trustee and thus a fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), and/or each of the Seller Defendants was, at all relevant times, a party in interest to the ESOP within the meaning of ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H), because each owned 10% or more of Western Global.

### D.     John and Jane Does 1-5

38.     Plaintiff does not currently know the identity of other Seller Defendants, if any. When the identities of those not currently named, if any, are ascertained, Plaintiff will seek leave to join them under their true names.

### E.     Board of Directors and its Members

39.     At the time of the Transaction there were two members of the Board of Directors for Western Global Airlines, Inc: Defendants Jim Neff and Carmit P. Neff, who together are referred to as the "Selling Board Members." The two Selling Board Members had the power to appoint and did appoint Miguel Paredes and PFS together as Trustee to the Western Global Airlines Inc. ESOP prior to the ESOP Transaction. The two Selling Board Members thus had a fiduciary duty to monitor the Trustee's actions with respect to the Transaction.

40.     Based on the powers, actions and duties described herein, at all relevant times the Board of Directors and its members were fiduciaries of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or discretionary control respecting management of the Plan,

and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

### F.   The Company

41.   The Company, Western Global Airlines, Inc. is joined as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted. Western Global Airlines, Inc. may be found in this District because it conducts business in this District.

## FACTUAL ALLEGATIONS

### A.   Western Global Airlines Inc.

42.   Western Global was founded in 2013 by Jim and Sunny Neff. The Company bills itself as an innovative and leading air cargo transportation company. It serves more than 400 airports in 134 countries. Before October 2020, the Neff family (including the Seller Defendants) were 100% owners of Western Global.

43.   Western Global's corporate headquarters is in Estero, Florida.

44.   Western Global is incorporated in Delaware.

45.   Western Global stock is not and never was readily tradable on an established securities market.

### B.   The Plan

46.   Western Global adopted the Plan with an effective date of January 6, 2020.

47.   The Plan is a pension plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1).

48.   The Plan is identified in Department of Labor filings as a "Leveraged ESOP," and it is designed to invest primarily in the employer securities of Western Global.

49.     The Plan is an individual account plan, or defined contribution plan, under which a separate individual account was established for each participant. Employees of Western Global participate in the Plan.

50.     The Plan's 2020 Form 5500 states that it has 389 participants.

51.     The Plan's 2020 Form 5500 and Summary Plan Description (SPD) identifies the Western Global Board of Directors acting for the Company as the Administrator of the Plan.

52.     Western Global is the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B). Western Global also is the Plan's Administrator, within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

53.     The Plan is established and maintained pursuant to a written document known as the Plan Document. The assets of the Plan are held in trust, which is governed by the Western Global, Inc. Employee Stock Ownership Trust Agreement.

54.     The Plan Administrator has exclusive responsibility and authority to control and manage the operation and administration of the Plan.

55.     The Trustee, in turn, is responsible for investing and holding Trust Assets, voting shares of Company Stock held by the Plan, and making distributions from the Plan. The Trustee was responsible for negotiating and approving the share price for the Transaction.

56.     Based on the foregoing (and on information and belief, under the terms of the Plan Document), the Board of Directors (acting for the Company) and the Trustee are fiduciaries with respect to the Plan.

57.     Western Global is and was at the time of the ESOP Transaction a party in interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14).

58.     To effectuate their planned sale of Western Global, the Sellers established the ESOP, an ERISA-protected defined contribution plan where employer contributions made on behalf of employees are invested in the employer's stock. ERISA § 407(d)(6),

29 U.S.C. § 1107(d)(6); *see also* 29 C.F.R. § 2550.407d–6 (definition of the term "employee stock ownership plan").

59.     The employer contributions, invested in employer stock, are part of employee compensation and comprise an important part of employee retirement savings.

60.     Because—and only because—an ESOP contribution qualifies as employee compensation, an employer can deduct the total value of its ESOP contribution from its income tax liability as an ordinary business expense. 26 U.S.C. § 404; 26 C.F.R. § 1.404(a)–1(b).

61.     As alleged further below, ERISA prohibits the sale of property, including common stock, by officers and directors of a company to a retirement plan sponsored by the company. ERISA § 406(a), 29 U.S.C. § 1106(a).

62.     Here, because the Western Global stock that the Sellers sold to the ESOP does not trade on a public market, the share value is determined annually by a stock appraiser or valuation firm. The valuation of Western Global stock is heavily determined by a discounted cash flow method of valuation where the stock's value is driven by financial projections of Western Global's future cash flow and earnings, which are generated by the Selling Board Members.

63.     To complete the planned sale of Western Global to the ESOP, two of the Sellers, Jim and Carmit Neff, acting as Board members, appointed Paredes and PFS as the Trustee of the ESOP to represent the ESOP in the Transaction.

64.     The Trustee received consideration for its own personal account from Western Global for its services in the ESOP Transaction, in the form of fees and, on information and belief, an indemnification agreement, under a contract made when the Sellers still 100% owned Western Global.

65.     Defendant PFS was founded in February 2017. It registered as a limited liability company in California on February 24, 2017.

66.     On October 23, 2020, the Plan purchased from the Seller Defendants, directly or indirectly, 375,000 shares of Western Global common stock for $510 million. At that time, Western Global became 37.5% employee owned.

67.     To complete the ESOP Transaction, the Plan entered into a $510 million loan agreement with Western Global to purchase the shares of Western Global common stock from the Sellers.

**C.      Sellers Structured the Transaction to Retain Control over the Company, but the $510 Million Purchase Price Was Not Adequately Discounted for the ESOP's Lack of Control.**

68.     Jim Neff was CEO and a Director of Western Global prior to, at the time of, and after the ESOP Transaction, and continues in that role at present.

69.     At the time of the ESOP Transaction, Sellers were all parties-in-interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14), as 10 percent or more shareholders, directly or indirectly, of Western Global, and/or as directors, and/or as officers or individuals having powers or responsibilities similar to those of officers. (They were also fiduciaries.)

70.     As discussed above, the Sellers ensured they retained control over Western Global's Board and operations, despite the contemplated sale to the ESOP, by selling only 37.5% of the Company's stock and by retaining control over the Trustee through their appointment power.

71.     The powers to determine the Board members and to manage a company's operations are the main hallmarks of control over a corporation. No rational buyer, acting at arm's-length, would pay fair market value for a company if the buyer did not obtain control over the purchased company. And few buyers would be willing to buy a significant stake in a company if they could obtain no control over the company.

72.     Because the ESOP did not gain any control over Western Global as a result of the Transaction, the purchase price the ESOP paid should have been heavily discounted, to reflect the lack of control. However, the valuation which was used to set

the purchase price of $510 million for the ESOP Transaction was not adequately discounted for the utter lack of control that the ESOP obtained after it purchased the Company.

**D.     The Transaction Price Reflected Inaccurate Financial and Economic Inputs.**

73.     The Selling Board Members, James and Carmit Neff, controlled Western Global prior to the ESOP Transaction and provided financial projections to the Trustee for the valuation for the ESOP Transaction. The Selling Board Members, who stood to gain from the ESOP paying an inflated amount for the WGA stock, were incentivized to provide unrealistic financial projections for use in the stock valuation.

74.     The factual allegations in this paragraph will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. The Trustee did not perform due diligence in the course of the ESOP Transaction similar to the due diligence that is performed by third-party buyers in large corporate transactions. The Trustee's due diligence in the ESOP Transaction was less extensive and thorough than the due diligence performed by third-party buyers in corporate transactions of similar size and complexity. The Plan overpaid for Western Global stock in the ESOP Transaction due to the Trustee's reliance on unrealistic growth projections, unreliable or out-of-date financials, improper discount rates, inappropriate comparable companies, and/or its failure to test assumptions, failure to question or challenge underlying assumptions, and/or other factors that rendered its valuation of Western Global stock in the ESOP Transaction faulty. The valuation likewise did not adequately reflect the diminished value of the Company as a result of the $350 million junk bond offering used to finance the ESOP. The Company issued those bonds at an inflated interest rate to attract investors, saddling the Company with debt that was not adequately reflected in the valuation. Nor did the valuation adequately reflect the fact that Congress demanded WGA repay a $34 million loan it had received as part of the Covid-19 relief package known as the Paycheck Protection Act. Due to the Plan's overpayment, the

13

Plan's participants, including Plaintiff, received diminished stock allocations, saw their Plan take on excessive debt to finance the Transaction, and suffered losses to their individual Plan account.

75.    The Sellers originally sought to sell up to 49% of Western Global to the ESOP; however, that required selling hundreds of millions of dollars in junk bonds that the Sellers were ultimately unable to sell.

76.    In August of 2020, the Sellers tried to raise $420 million through junk bonds which would allow the Sellers to cash out of a large part of their interest in Western Global, Inc. The Sellers originally tried to sell the junk bonds at a yield of 8.25% to 8.5%. However, the Sellers were forced to increase the yield on the junk bonds to rates ranging from 8.75% to 9% (and in some cases over 10%), which reporters viewed as "a sign of tepid demand from potential investors" and ultimately the Sellers were forced to reduce the junk bond offering to $350 million.

77.    The Trustee had incentives to act in favor of the Seller Defendants in the ESOP Transaction in breach of its duty of loyalty to the Plan. These incentives included the possibility of business from sellers of companies who understood that the Trustee applied a lesser degree of due diligence in ESOP purchases of businesses than is typical for non-ESOP-buyers' purchases of businesses, and engagement as the Plan's ongoing Trustee after the ESOP Transaction and the fees paid for that engagement.

78.    The Trustee is liable to the Plan for the difference between the price paid by the Plan and the fair market value of Western Global shares at the time of the ESOP Transaction.

79.    The Seller Defendants are liable to the Plan to repay the difference between the price they received and the fair market value of their Western Global shares at the time of the ESOP Transaction.

80.    The terms of the Transaction required Western Global to make contributions in amounts sufficient for the ESOP to service the debt, which puts financial strain on the Company. Specifically, the ESOP Transaction also negatively

impacted Western Global's future cash flows because the Company is obligated to contribute $230 million to the ESOP from 2021 to 2025 just to allow the ESOP to make all loan payments due. And because the Company's contributions to the ESOP so far have gone entirely to the payment of interest and principal on the loan, participants have received less for their own retirement accounts.

81.     According to the ESOP's financial statements filed with the Department of Labor, the ESOP reported that the value of Western Global stock was $875 per share, or $328,188,750 in the aggregate, on December 31, 2020. Thus, the value of the Western Global stock reported by the ESOP a couple months after the sale was only 64% of what the ESOP paid for it.

82.     Contributions made to employees' individual accounts are an important part of Western Global employee compensation under ERISA. *See* 26 U.S.C. § 404; 26 C.F.R. § 1.404(a)-1(b).

83.     The ESOP is wholly undiversified, meaning the Company is the ESOP's only investment. The retirement savings of Plaintiff and other ESOP participants therefore depend on the Company continuing to be a viable business with a steadily increasing value. Yet the Company has been significantly weakened by the Transaction, and the Western Global stock the ESOP purchased is worth far less than what the ESOP paid for it.

84.     PFS and the Board of Directors had fiduciary duties under ERISA to act prudently and in the best interest of the employee participants. See 29 U.S.C. § 1104(a)(1)(A)-(B). However, at all relevant times, they failed to do so. Among other things, they failed to perform adequate due diligence to ensure the $1360 per share stock appraisal was based on reliable cash flow and earnings projections, disregarded other structural problems with the Transaction and ongoing conflicts of interest, and failed to appropriately discount the value of the Company stock due to the complete lack of control the ESOP obtained. As a result of Defendants' actions, ESOP participants suffered substantial losses, and their retirement accounts are worth far less than they

1  would have been had Defendants not violated ERISA through their actions in

2  connection with the ESOP Transaction.

3  <center>**PLAINTIFF SEEKS PLAN-WIDE RELIEF**</center>

4  85.   Plaintiff brings these claims for plan-wide relief pursuant to ERISA

5  § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief against any Defendant in a non-fiduciary

6  capacity under § 502(a)(3), 29 U.S.C. § 1132(a)(3), and as a class action pursuant to

7  Federal Rule of Civil Procedure 23(a) and (b), on behalf of the following Class:[3]

8
9  > All participants in the Western Global ESOP on or after June 6, 2020,
   > who vested under the terms of the ESOP, and those participants'
   > beneficiaries, excluding Defendants and their immediate family
10 > members; any fiduciary of the Plan; the directors of Western Global or
   > of any entity in which a Defendant has a controlling interest; and legal
11 > representatives, successors, and assigns of any such excluded persons.

12  86.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides that "[a] civil action

13  may be brought . . . by a participant, beneficiary or fiduciary for appropriate relief under

14  [ERISA section 409, 29 U.S.C.] section 1109." In turn, ERISA 29 U.S.C. § 1109 states

15  that any fiduciary with respect to a plan who breaches "any of the responsibilities,

16  obligations, or duties imposed upon fiduciaries by this subchapter *shall be personally*

17  *liable to make good to such plan any losses resulting from each such breach*." 29 U.S.C.

18  § 1109(a) (emphasis added).

19  87.   The Supreme Court has explained that Plaintiff's ERISA § 502(a)(2), 29

20  U.S.C. § 1132(a)(2), claims are necessarily "brought in a representative capacity on

21  behalf of the plan as a whole." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142

22  (1985). In other words, the relief Plaintiff seeks pursuant to § 1132(a)(2) "inures to the

23  benefit of the plan *as a whole*." *Id.* at 140.

24  88.   *LaRue v. DeWolff, Boberg, and Associates, Inc.*, 552 U.S. 248 (2008),

25  which involved a defined contribution plan like the Western Global ESOP, further

26  demonstrated that "[ERISA] §§ 409(a) and 502(a)(2) [29 U.S.C. §§ 1109 and

27
28  ---
   [3] Plaintiff reserves the right to revise the class definition, and to propose other or additional classes in
   subsequent pleadings or a motion for class certification, after discovery in this action.

<center>16</center>

1132(a)(2)] permit recovery of *all* plan losses caused by a fiduciary breach." *LaRue*, 552 U.S. at 261 (Thomas, J., concurring).

89. **Numerosity.** The Class satisfies the numerosity requirement because it is composed of hundreds of persons. Although the exact number and identities of Class members are unknown to Plaintiff at this time, the Plan's Form 5500 filing for 2020 indicates that as of December 31, 2020, there were nearly 400 participants in the Plan. The number of Class members is so large that joinder of all its members is impracticable.

90. **Commonality.** As to the members of the Class, this case presents numerous common questions of law and fact, among them:

a. Whether Defendants Paredes and PFS engaged in a prudent and loyal investigation of the proposed purchase of 37.5% of Western Global stock by the ESOP in the Transaction, including whether the Transaction's terms and price were fair and in the best interest of ESOP participants;

b. Whether Defendants Paredes and PFS failed to properly consider the reduced cash flow the Company would suffer due to its obligation to make contributions to the ESOP in an amount sufficient to cover the ESOP's loan payments and due to the excessive interest rate on its multi-hundred million junk bond offering;

c. Whether the ESOP engaged in prohibited transactions;

d. Whether the Seller Defendants were ERISA fiduciaries of the Plan;

e. Whether the Seller Defendants breached their ERISA fiduciary duties owed to the Plan and its participants when they selected and monitored the Trustee and Plan Administrator as Plan fiduciaries;

f. The amount of losses suffered by the ESOP as a result of the unlawful conduct alleged herein;

g. The proper form of equitable and injunctive relief; and

h. The extent to which any non-fiduciary Defendants are subject to equitable remedies and relief.

91. **Typicality.** Plaintiff's claims are typical of the claims of the Class because (among other things): (a) he is employed by Western Global and is a participant in the Plan; (b) to the extent that Plaintiff seeks relief on behalf of the Plan pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), his claims are not only typical of, but the

1  same as, a claim under § 502(a)(2) brought by any other Class member; (c) to the extent
2  that Plaintiff seeks equitable relief, that relief would affect all Class members equally;
3  and (d) all of the Class members were injured and continue to be injured in the same
4  manner, because each of them overpaid for Western Global stock as a result of the same
5  alleged breaches of fiduciary duty and prohibited transactions.

6      92.   **Adequacy.** Plaintiff will fairly and adequately protect the interests of the
7  Class and is committed to the vigorous representation of the Class. Plaintiff's retained
8  counsel, Stris & Maher LLP and Cohen Milstein Sellers and Toll PLLC, are experienced
9  in class action and ERISA litigation, and Plaintiff has no interests antagonistic to or in
10  conflict with the interests of the Class.

11     93.   **Rule 23(b)(1)(A).** Class certification is appropriate pursuant to Federal
12  Rule of Civil Procedure 23(b)(1)(A). Fiduciaries of ERISA-covered plans have a legal
13  obligation to act consistently with respect to all similarly situated participants and to act
14  in the best interests of the ESOP and its participants. This action challenges whether
15  Defendants acted consistently with their fiduciary duties or otherwise violated ERISA
16  as to the ESOP as a whole. As a result, prosecution of separate actions by individual
17  members would create the risk of inconsistent or varying adjudications that would
18  establish incompatible standards of conduct for Defendants relating to the ESOP. The
19  Class may be certified under Rule 23(b)(1)(A).

20     94.   **Rule 23(b)(1)(B).** Class certification is also appropriate pursuant to
21  Federal Rule of Civil Procedure 23(b)(1)(B). Administration of an ERISA-covered plan
22  requires that all similarly situated participants be treated the same. Resolving whether
23  Defendants fulfilled their fiduciary obligations to the ESOP and engaged in prohibited
24  transactions with respect to the Plan would, as a practical matter, be dispositive of the
25  interests of the other participants in the ESOP and would substantially impair or impede
26  their ability to protect their interests if they are not made parties to this litigation by
27  being included in the Class. Further, the relief granted by the Court, including any

28

1    equitable relief, injunctive relief, or accounting of profits, may be dispositive of the

2    interests of other Class members.

3         95.    **Rule 23(b)(2).** Additionally, and alternatively, class certification is

4    appropriate pursuant to Federal Rule of Civil Procedure (b)(2) because Defendants have

5    acted or refused to act on grounds generally applicable to the Class, making appropriate

6    declaratory and injunctive relief with respect to Plaintiff and the Class as a whole. This

7    action challenges whether Defendants acted consistently with their fiduciary duties or

8    otherwise violated ERISA as to the ESOP as a whole. The members of the Class are

9    entitled to declaratory and injunctive relief to remedy Defendants' fiduciary violations.

10        96.    **Rule 23(b)(3)**. Additionally and alternatively, class certification is

11   appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because questions of

12   law and fact common to all Class members predominate over any questions affecting

13   individual members of the Class, and because a class action is superior to other available

14   methods for the fair and efficient adjudication of this action. Common questions related

15   to liability will necessarily predominate over any individual questions because

16   Defendants' duties and obligations were uniform to all participants and therefore all

17   members of the Class. Plaintiff and all Class members have been harmed by the ESOP

18   paying more than fair market value for Western Global stock in the Transaction. As

19   relief and any recovery will be on behalf of the Plan, common questions as to remedies

20   will likewise predominate over any individual issues.

21        97.    A class action is a superior method to other available methods for the fair

22   and efficient adjudication of this action. As the claims are brought on behalf of the

23   ESOP, the issues in this litigation will be most efficiently resolved in a single

24   proceeding rather than multiple proceedings. The losses suffered by individual Class

25   members are small compared to the expense and burden of individual prosecution of

26   this action. In addition, class certification is superior because it will obviate the need

27   for unduly duplicative litigation which might result in inconsistent judgments about

28   Defendants' duties with regard to the ESOP.

98.     The following also favor certification of this case as a class action:

(a)     No other litigation concerning this controversy has been filed by any other members of the Class; and

(b)     The names and addresses of the Class members are available from the ESOP.

99.     Notice will be provided to all members of the Class to the extent required by Federal Rule of Civil Procedure 23.

## CAUSES OF ACTION

**Count I**
**Causing and Engaging in Prohibited Transactions in Violation of**
**ERISA § 406, 29 U.S.C. § 1106**
**(Against PFS and Miguel Paredes)**

100.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

101.    ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits a plan fiduciary, here the Trustee (PFS and Miguel Paredes), from causing a plan, here the Plan, to engage in a sale or exchange of any property, here Western Global stock, with a party in interest, here the Seller Defendants and/or Western Global, as took place in the ESOP Transaction.

102.    ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), prohibits the Trustee from causing the Plan to borrow money from a party-in-interest, here Western Global, as took place in the ESOP Transaction.

103.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits the Trustee from causing the Plan to engage in a transaction that constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest, here the Seller Defendants, of any assets of the Plan, as took place in and after the ESOP Transaction with the transfer of Plan assets as payment for Western Global stock and in continuing payments on the loan.

104.    The stock and loan transactions between the Plan and the parties-in-interest were authorized by the Trustee in its capacity as trustee for the Plan.

CLASS ACTION COMPLAINT
CASE NO. 2:21-CV-9615

105.   The Trustee caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a), 29 U.S.C. § 1106(a), in the ESOP Transaction.

106.   ERISA § 406(b), 29 U.S.C. § 1106(b), *inter alia*, mandates that a plan fiduciary shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants," or "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

107.   The Trustee caused the Plan to acquire Western Global stock from the Seller Defendants and/or Western Global at a price above fair market value and with the proceeds of a loan that was used to pay the Seller Defendants. This primarily benefited the Seller Defendants to the substantial detriment of the Plan and its participants and beneficiaries, even though the Trustee was required to act solely in the interests of the Plan's participants and beneficiaries in connection with any such transaction.

108.   The Trustee received consideration for its own personal account from Western Global—fees and, on information and belief, an indemnification agreement— as trustee for the Plan in the ESOP Transaction, in violation of ERISA § 406(b)(3).

109.   The Trustee caused and engaged in prohibited transactions in violation of ERISA § 406(b), 29 U.S.C. § 1106(b), in the ESOP Transaction.

110.   ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

111.   ERISA § 502(a), 29 U.S.C. § 1132(a), permits a plan participant to bring a suit for relief under ERISA § 409 and to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

112.   The Trustee has caused losses to the Plan by the prohibited transactions in an amount to be proved specifically at trial.

**Count II**
**Breach of Fiduciary Duty Under ERISA § 404(a), 29 U.S.C. § 1104(a)**
**(Against PFS and Miguel Paredes)**

113.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

114.   ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia*, that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan and defraying reasonable expenses of administering the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

115.   The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

116.   ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

117.   ERISA § 502(a), 29 U.S.C. § 1132(a), permits a plan participant to bring a suit for relief under ERISA § 409 and to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

118.   The Trustee was required to undertake an appropriate and independent investigation of the fair market value of Western Global stock in or about June 2020 in order to fulfill its fiduciary duties, and an appropriate investigation would have revealed that the valuation used for the ESOP Transaction did not reflect the fair market value of the Western Global stock purchased by the Plan.

119.   The Trustee breached its duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

120.   The Trustee has caused losses to the Plan by its breaches of fiduciary duty in an amount to be proved specifically at trial.

**Count III**
**Violation of ERISA §§ 410 and 404(a)(1)(A), (B),**
**29 U.S.C. §§ 1110 and 1104(a)(1)(A), (B),**
**(Against PFS and Miguel Paredes)**

121.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

122.   ERISA § 410(a), 29 U.S.C. § 1110(a), provides in relevant part (with exceptions not applicable here) that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [Part IV of Subtitle B of Title I of ERISA] shall be void as against public policy." As ERISA § 406 is under Part IV, any provision that attempts to relieve the Trustee, a Plan fiduciary, of responsibility or liability is void pursuant to ERISA § 410(a) unless there is an exception or exemption. No such exception or exemption is applicable to the Count I claim here.

123.   ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach,

and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

124.   ERISA § 502(a), 29 U.S.C. § 1132(a), permits a plan participant to bring a suit for relief under ERISA § 409 and to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

125.   The indemnification agreement purports to provide payment or reimbursement for the benefit of the Trustee for its expenses, losses, costs, and damages, including but not limited to attorneys' fees.

126.   To the extent that the indemnification agreement attempts to relieve the Trustee of its responsibility or liability to discharge its duties under ERISA, or attempts to have Western Global (a Plan-owned company) and thereby the Plan be responsible for the Trustee's liability for breaches of the statute, including but not limited to defense costs, such provisions are void as against public policy.

127.   To the extent that any of the fiduciaries of the Plan would agree to the exercise of such a provision that is void against public policy under ERISA § 410, they breached their fiduciary duties under ERISA by failing to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and aims, in violation of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B). *See also* ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1).

**Count IV**
**Co-Fiduciary Liability Under ERISA § 405(a), 29 U.S.C. § 1105(a)**
**(Against Selling Board Members and the Board of Directors)**

128.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

129.   ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another

1  fiduciary with respect to the same plan . . . if he participates knowingly in, or knowingly

2  undertakes to conceal, an act or omission of such other fiduciary."

3      130.   James Neff and Carmit Neff, both members of the Board prior to the

4  Transaction, and the Board of Directors had the authority to (1) appoint the Trustee and

5  to (2) either appoint the Plan Administrator or act as Plan Administrator who in turn

6  had the power to direct the ESOP Trustee. As such, they were fiduciaries to the ESOP

7  at all relevant times.

8      131.   The Selling Board Members were also the highest-level management at

9  Western Global and were involved in and directed the preparation of the financial

10  projections underlying the stock appraisal that the Trustee relied upon in determining

11  (i) the purchase price the ESOP paid for the Company; and (ii) the subsequent valuation

12  of Western Global stock at year-end 2020.

13      132.   Given their involvement in hiring and directing the Trustee (through the

14  Plan Administrator), the Selling Board Members knew or should have known that the

15  price the ESOP paid for Western Global stock was not adequately discounted to reflect

16  the fact that the Sellers retained control over the Company.

17      133.   Based on their position and unique access to company financial

18  information and involvement in hiring and directing the Trustee, the Selling Board

19  Members knowingly participated in the fiduciary violations of the Trustee alleged

20  above and knew that the Trustee—PFS and Paredes—failed to undertake an appropriate

21  and independent investigation of the fair market value of Western Global stock prior to

22  the ESOP Transaction.

23      134.   As such, under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), the Selling

24  Board Members are liable as co-fiduciaries for the ESOP's losses resulting from the

25  Trustee's fiduciary breaches.

26      135.   ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3) provides that fiduciaries "with

27  respect to a plan shall be liable for a breach of fiduciary responsibility of another

28  fiduciary with respect to the same plan" "if he has knowledge of a breach by such other

fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

136.   The Selling Board Members failed to make reasonable efforts to remedy the Trustee's violations of ERISA associated with the ESOP Transaction.

137.   For example, the Selling Board Members could have simply returned the overpayment for the Western Global stock that they received from the ESOP Transaction, but because of their conflicts of interest they failed to do so.

138.   At a bare minimum, the Selling Board Members could have brought the matter to the attention of the Secretary of Labor.

139.   Instead, the Selling Board Members took no actions and made no efforts to remedy the fiduciary violations of the Trustee. Thus, pursuant to ERISA §§ 405(a)(3), 29 U.S.C. §§ 1105(a)(3), the Selling Board Members are liable as co-fiduciaries for the ESOP's losses resulting from the Trustee's fiduciary breaches.

**Count V**
**Prohibited Transaction in Violation of ERISA § 406, 29 U.S.C. § 1106**
**(Against Seller Defendants)**

140.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

141.   The Seller Defendants were fiduciaries to the Plan and/or parties-in-interest to the Plan under ERISA, as described above.

142.   ERISA § 406(b), 29 U.S.C. § 1106(b) prohibits a fiduciary from engaging in self-dealing transactions with the Plan.

143.   To the extent any Seller is a fiduciary, by selling their shares to the Plan (and doing so for greater than fair market value), the Sellers engaged in a prohibited transaction under § 1106(b).

144.   Plaintiff may accordingly obtain relief against Sellers on behalf of the Plan under 29 U.S.C. § 1132(a)(2).

145.   In addition to Plan-wide relief under 29 U.S.C. § 1132(a)(2), the statute (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)) permits a plan participant to bring a civil

action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

146.   The Supreme Court has held that anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

147.   As a result of the prohibited transactions described above, the Seller Defendants received Plan assets in payments above fair market value for their Western Global stock.

148.   The Seller Defendants knew or should have known: (1) about the existence of the Plan, (2) about the Plan's purchase, directly or indirectly, of their Western Global stock in the ESOP Transaction, (3) that the Trustee was a fiduciary to the Plan, (4) that they were directors and/or 10% or more shareholders of Western Global or otherwise parties-in-interest, and (5) that the Trustee caused the Plan to engage in the stock purchase transaction.

149.   As directors and/or officers of the Company and as selling shareholders, the Seller Defendants were aware of sufficient facts that the ESOP Transaction constituted a prohibited transaction with parties-in-interest.

150.   Accordingly, even to the extent any Seller is not a fiduciary, the Seller Defendants are liable as parties-in-interest for violations of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D).

151.   The Seller Defendants have profited from the prohibited transactions in an amount to be proven at trial, and upon information and belief, they remain in possession of some or all of the assets that belong to the Plan.

152.   The Seller Defendants are subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(2) and/or (a)(3), including disgorgement of any profits, accounting for profits, surcharge, having a constructive trust placed on any proceeds received (or which

are traceable thereto), having the transactions rescinded, requiring all or part of the consideration to be restored to the Plan, or to be subject to other appropriate equitable relief.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself, the ESOP, and the Class, prays that judgment be entered against Defendants on each Count and that the ESOP and the Class be awarded the following relief:

A. Declare that Defendant Trustee caused the Plan to engage in and itself engaged in prohibited transactions and breached its duties under ERISA;

B. Declare that the Seller Defendants have knowingly participated in the Trustee's violations of ERISA;

C. Declare that the Seller Defendants had knowledge of the Trustee's breach but failed to make reasonable efforts to remedy that breach because of their own self-interest in keeping the ESOP's overpayment for Western Global stock;

D. Declare that the indemnification agreement between Defendant Trustee and Western Global violates ERISA § 410, 29 U.S.C. § 1110;

E. Order Defendant Trustee to reimburse Western Global for any money paid by Western Global under any indemnification agreement between the Trustee and Western Global, plus interest;

F. Rescind the Transaction in whole or in part;

G. Enjoin the Trustee and the Seller Defendants from further violations of their fiduciary responsibilities, obligations, and duties;

H. Remove Paredes and PFS as the Trustee of the Western Global ESOP and bar them from serving as a fiduciary of the ESOP in the future;

I. Appoint a new independent fiduciary to manage the Western Global ESOP and order the costs of such independent fiduciary be paid for by Defendants;

J. Order each Defendant found to have violated ERISA to jointly and severally make good to the Plan and/or to any successor trust(s) the losses resulting from the breaches of ERISA and restore any profits it, he, or she has made through use of assets of the Plan;

K. Order that Defendants provide other appropriate equitable relief to the Plan and its participants and beneficiaries, including, but not limited to, surcharge, providing an accounting for profits, disgorgement of profits (including any interest or investment returns), and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

L.  Order the proceeds of any recovery for the Plan to be allocated to the accounts of the Class members to make them whole for any injury that they suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

M.  Order the allocation to the accounts of the class members of the additional shares of stock that would have been allocated but for the Plan's overpayment on company stock and Defendants' breaches of ERISA;

N.  Enjoin the Defendants from dissipating any of the proceeds they received from the Transaction held in their actual or constructive possession until the ESOP participants' rights can be adjudicated;

O.  Enjoin the Defendants from transferring or disposing of any of the proceeds they received from the Transaction to any person or entity, which would prejudice, frustrate, or impair the ESOP participants' ability to recover the same;

P.  Require Defendants to pay attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or order payment of fees and expenses to Plaintiff's counsel on the basis of the common benefit or common fund doctrine out of any money recovered for the Class;

Q.  Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiff as class representative and his counsel as class counsel;

R.  Award pre-judgment interest and post-judgment interest; and

S.  Award such other and further relief that the Court determines is appropriate pursuant to ERISA § 502(a)(2) and/or (a)(3), 29 U.S.C. § 1132(a)(2) and/or (a)(3), or pursuant to Rule 54(c) of the Federal Rules of Civil Procedure, or that is equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

December 13, 2021

Respectfully submitted,

s/ Peter K. Stris

**STRIS & MAHER LLP**
Peter K. Stris
Rachana A. Pathak
Douglas D. Geyser
John Stokes
777 S. Figueroa St., Suite 3850
Los Angeles, CA 90017
(213) 995-6800
pstris@stris.com
rpathak@stris.com
dgeyser@stris.com
jstokes@stris.com

Tillman J. Breckenridge (*pro hac vice* forthcoming)
1717 K Street Northwest, Suite 900
Washington, DC  20006
(202) 800-6030
tbreckenridge@stris.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Michelle C. Yau (*pro hac vice* forthcoming)
Mary J. Bortscheller (*pro hac vice* forthcoming)
Daniel R. Sutter (*pro hac vice* forthcoming)
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
(202) 408-4600
myau@cohenmilstein.com
mbortscheller@cohenmilstein.com
dsutter@cohenmilstein.com

*Attorneys for Plaintiff*

30